Percy D. AYRES
v.
MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC.
Civ. A. No. 71–2986.

United States District Court,
E. D. Pennsylvania.
Jan. 19, 1973.

David L. Grove, Montgomery, Mc-Cracken, Walker & Rhoads, Philadelphia, Pa., for plaintiff.

C. Clark Hodgson, Jr., Stradley, Ronan, Stevens & Young, Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

## OPINION

The defendant, Merrill Lynch, Pierce, Fenner & Smith, Inc., (hereinafter referred to as "Merrill Lynch") moves to stay all proceedings in this action pending arbitration of the questions presented by the plaintiff, in accordance with the constitution and rules of the New York Stock Exchange (hereinafter referred to as "NYSE"). The underlying question raised by the defendant's motion is whether a non-member registered representative who purchases securities from an employer-member firm solely as a result of his employment is subject to Rule 347(b) of the New York Stock Exchange, which compels arbitration of employment-related disputes? Phrased differently, does a non-member registered representative have the same legal rights which a customer non-employee would have? For reasons which hereinafter follow, the Court concludes that defendant's motion shall be granted and this controversy shall be submitted to arbitration.

This action was brought by the plaintiff, Percy D. Ayres, pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970) ("the 1934 Act"), and Rule 10b–5 of the Securities Exchange Commission promulgated thereunder, 17 C.F.R. § 240.10b–5 (1972). Jurisdiction is vested in the Court under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1970) and 28 U.S.C. § 1332 (1970).

Ayres was employed as an account executive and registered representative in defendant's Philadelphia office from 1940 until his voluntary retirement on October 1, 1970, two days prior to his 68th birthday. The defendant's retirement policy required its employees attaining the age of 65 years to retire, provided, however, that at the discretion of the defendant those employees, who upon attaining the foregoing age but who remained productive employees, were thereafter permitted to continue in defendant's employ on a year-to-year basis, with mandatory retirement at the age of 70 years. Pursuant to this policy, plaintiff remained in defendant's employ after he had reached 65 years of age on October 3, 1967.

Merrill Lynch is a member of the NYSE and is subject to its constitution, rules and regulations. Under Rule 345(a) of the Rules of the Board of Governors of the Exchange no member or member organization shall:

"(1) Permit any persons to perform regularly the duties customarily performed by a registered representative, unless such person shall have been registered with and is acceptable to the Exchange."

In accordance with Rule 345, plaintiff submitted the required NYSE Form No. RE–1 on April 16, 1945, and his application to become a registered representative was accepted in May, 1945.

In becoming a registered representative, Ayres agreed to submit to the jurisdiction of NYSE.[1] On April 17, 1958, the Board of Governors adopted Rule 347(b) which required disputes pertaining to employment between registered representatives and members of the Exchange to be resolved by arbitration.[2] On December 19, 1961, plaintiff again pledged himself to be bound by the constitution and rules of the Board of Governors of the Exchange and any amendments thereto, when he applied to the Exchange for approval as a holder of 15 shares of non-voting common stock of Merrill Lynch, pursuant to Article IX, Section 7 of the Constitution of the Exchange; plaintiff's application was approved by the Exchange in January, 1962.

On January 26, 1962, and December 14, 1964, plaintiff purchased from Merrill Lynch 1500 shares and 500 shares, respectively, of its non-voting common stock at costs of $32,415 and $17,326.50. By reason of subsequent two-for-one stock splits in 1966 and 1969, plaintiff's original purchases of 2000 shares of non-voting common stock had increased to 8000 shares at the time of his retirement on October 1, 1970. With each acquisition of defendant's stock, plaintiff executed a Stock Subscription Agreement which provided, among other things, that Merrill Lynch reserved the right at any time to purchase all or any part of plaintiff's stock for a period of 90 days from the date defendant furnished plaintiff with written notice that it had elected to exercise its purchase rights.

The rules and regulations of the NYSE were further amended on March 26, 1970, so as to permit corporate members of the NYSE to offer their stock for sale to the public. As a result of this amendment, plaintiff's complaint alleges that on or about July 14, 1970, Merrill Lynch initially decided to become a publicly owned corporation, but wrongfully concealed from plaintiff and others this information until the summer of 1971, even though in July, 1970, defendant's management had set as its goal a public offering of its stock in the Spring of 1971. Moreover, in implementation of this July, 1970 decision, defendant established a secret "Going Public Task Force" to compile data for the preparation of a prospectus for defendant's stock that would be publicly offered for sale.

During the late summer of 1970 when plaintiff advised defendant of his intention to retire, he was informed by the Vice-President of Merrill Lynch and manager of its Philadelphia office that upon plaintiff's retirement he would be required to sell his 8000 shares of defendant's stock to defendant on or about October 1, 1970, for the price of $26.133 per share, or a total of $209,064. Had Ayres not sold the stock to Merrill Lynch, he contends that by June 23, 1971, when Merrill Lynch had its first public offering, he could have sold the same stock to the public for $672,000. Furthermore, due to a three-for-one stock split in April, 1971, plaintiff would have received a dividend payment of $2400, $0.10 a share on the 24,000 shares he then would have owned. Simi-

---

1. Paragraph 31 of NYSE Form No. RE-1 provided:

   "I hereby certify that the following statements are true and complete, and in consideration of the New York Stock Exchange's approving my application, I submit myself to the jurisdiction of such Exchange, and I agree as follows:

   \*     \*     \*     \*     \*

   "(g) I am familiar with the rules and regulations of the New York Stock Exchange pertaining to the employment of so-called registered employees, and I agree to abide by the existing rules and all amendments thereto."

2. NYSE Rule 347(b) stated:
   "(b) Any controversy between a registered representative and any member organization arising out of the employment or termination of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party in accordance with the arbitration procedure prescribed elsewhere in these rules."

larly, there were additional dividend payments in the amount of $0.10 per share in August, 1971 and November, 1971.

Finally, on or before June 23, 1971, Merrill Lynch removed from its owners of common stock all restrictions relating to transferability and acquisition rights of defendant, with the single exception being that the current owners of common stock could not sell, option for sale, or otherwise dispose of the shares for a period of one year from the termination of the public offering held in June, 1971. Plaintiff therefore contends that if Merrill Lynch had not breached its fiduciary duties owed to him by failing to disclose material facts affecting the value of the stock, then he would not have retired on October 1, 1970, and after June 23, 1971, he would have been subject only to the single restriction noted earlier in this paragraph.

In opposition to defendant's motion to stay these proceedings pending arbitration, plaintiff advances several arguments, viz.: (1) This controversy is not subject to arbitration under Rule 347(b) of the NYSE since it did not arise "out of the employment or termination of employment" of plaintiff as a registered representative by the defendant; and (2) he is not a "member" of the Exchange, as defined in § 3(a)(3) of the 1934 Act, 15 U.S.C. § 78c(a)(3) (1970), neither is he bound by § 28(b)(2) of the 1934 Act, 15 U.S.C. § 78bb(b)(2) (1970), and therefore § 29(a) of the 1934 Act, 15 U.S.C. § 78cc(a) (1970), rendering unenforceable prospective agreements to arbitrate, controls rather than the exemption provisions as contained in § 28(b) of the 1934 Act, 15 U.S.C. § 78bb(b) (1970).

## I.

Plaintiff and defendant are essentially in agreement on most of the facts as previously recorded, but are at odds pertaining to the characterization of the dispute and the role to be served by the NYSE regarding arbitration. Ayres most vigorously asserts that the obligation owed to him by the defendant arose not from his association with Merrill Lynch as an employee, but instead stemmed from the fiduciary duties existing between a purchaser and seller of securities. In other words, as an owner of stock plaintiff was entitled to know about Merrill Lynch's decision to go public even though, as plaintiff concedes, this same information need not have been disclosed to other employees of the defendant who owned no stock.

As a discussion of the relevant cases will subsequently demonstrate, plaintiff's position is indeed unique in that (1) although Ayres is a registered representative of NYSE, the current controversy does not clearly and squarely relate to the business functions and commercial transactions normally engaged in by a registered representative of the Exchange in the performance of his prescribed duties; and (2) Ayres is not a member of the Exchange as has been true in most of the applicable cases. Notwithstanding the plaintiff's atypical circumstances there is one factor evident in this case which I deem to be particularly compelling and dispositive, and thus dictates the result which I herein reach today. That is, Ayres was initially permitted to purchase the shares of Merrill Lynch only because he was one of its employees. Moreover, Ayres' decision to retire when he did might have precipitated Merrill Lynch's exercising its re-purchase option and hence the Court is further confronted with a dispute which arose not only out of the course of employment of a registered representative, but additionally stemmed from the termination of that employment.[3]

---

3. In this regard, the Court is mindful of plaintiff's contention that his retirement at that time was indeed voluntary and that he was physically capable of working for a longer period. Further, the Court is aware that the alleged breach of the fiduciary obligations in question occurred prior to, and was continuing at the time of, plaintiff's tendering his offer of resignation.

In examining the Stock Subscription Agreement it appears that the defendant's decision to sell stock to Ayres was premised on Ayres' status as an employee. More specifically, the Agreement states:

"Whereas, the Purchaser is an employee of the Corporation or of another corporation controlled directly or indirectly by the Corporation, and the Corporation desires to make available to the Purchaser an opportunity to purchase shares of its Non-voting Common Stock, and the Purchaser desires to purchase such shares, upon the terms and conditions hereinafter set forth:"

Paragraph 6 of the Agreement further stipulates that the Agreement was not assignable by the Purchaser.

Neither plaintiff's complaint nor any of the supporting or opposing papers filed in this case, discloses what other attempts, if any, were undertaken by Merrill Lynch to repurchase stock from other employees during this period (July 1970 through June 23, 1971) and how many employees owning stock of defendant retired during this time.

The facts in this case are remarkably similar to Ryan v. J. Walter Thompson Co., 322 F.Supp. 307 (S.D.N.Y.1971), aff'd 453 F.2d 444 (2d Cir. 1971), cert. denied 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972), though there are factual discrepancies. In *Ryan,* the plaintiff had purchased stock from the defendant at a time when the stock was sold only to its officers and employees. Whenever the stockholder desired to sell or terminate his employment or vacate his office, the defendant could repurchase the stock. Three years after Ryan had retired from the defendant, the defendant decided to go public and exercised its option to repurchase the plaintiff's shares. Although the defendant there, as in the instant case, did not disclose its intentions of having a public offering prior to the repurchase, the Court of Appeals concluded there were no anti-fraud violations under Rule 10b–5, since the plaintiff was obligated to sell irrespective of what he knew or did not know. 453 F.2d at 447. While the *Ryan* case does contain comparable facts, it can be distinguished as respects defendant's motion here, because that case did not specifically address itself to the question of arbitration and consequently, it was permitted to proceed to a conclusion on the merits in Court. A reading of *Ryan* does not reflect whether either party requested arbitration or, if requested, whether arbitration would have been proper under the circumstances, since Ryan was not a member of the Exchange or a registered representative.

Fershtman v. Schectman, 450 F.2d 1357 (2d Cir. 1971) cert. denied, 405 U. S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 766 (1972), is again another case, which goes to the merits of the instant dispute rather than to an analysis of the applicability of the arbitration clause provided in Rule 347(b).

Isaacson v. Hayden, Stone, Inc., 319 F.Supp. 929 (S.D.N.Y.1970) will be examined at this juncture, although later sections of the opinion will more extensively consider plaintiff's contention that he was not a member of the Exchange as defined in § 3(a)(3) of the 1934 Act, neither was he bound by § 28(b)(2) of the 1934 Act. In *Isaacson,* the Court held that a dispute was arbitrable in accordance with the rules of the NYSE, even though at the time plaintiff therein initiated the action he was no longer a member of the Exchange. In that case, the plaintiff, an allied member of NYSE and an officer of the defendant, purchased shares of stock from Hayden, Stone, also a member of NYSE. The controversy revolved around defendant's obligation to repurchase plaintiff's stock upon the latter's retirement. The Court took notice of the fact that as *members* of the Exchange they had agreed to arbitrate any controversy arising between them. Furthermore, the Court stated at pages 929–930 of 319 F.Supp:

"The controversy in this suit arises out of and relates directly to defend-

ant's business as a member of the New York Stock Exchange and defendant's obligations to public customers and others in relation to its obligation to plaintiff."

The Court did not in any way feel the obligation to arbitrate had been impaired or destroyed because plaintiff had ceased to be a member of the Exchange. Instead, the dispute was arbitrable because "the controversy flows from and is predicated upon the business relationship between the parties which arose during their mutual membership in the Exchange." *Id.* at 930.

By virtue of Ayres' status as an employee of Merrill Lynch he was enabled to acquire shares in the defendant subject to the restrictions embodied in the purchase agreement, a binding contractual document consisting of provisions and covenants voluntarily entered into by each of the parties and legally enforcible by either of them. This commercial transaction which occurred between Ayres and Merrill Lynch can only be construed as arising out of the former's employment as a registered representative with Merrill Lynch, even though Ayres acquired the securities for his own account and personal benefit and not as an intermediary for third parties.

Admittedly, the factual pattern in the case at bar is not of the same nature or

of the same dimensions as the dispute in Dickstein v. duPont, 443 F.2d 783 (1st Cir. 1971), which involved a registered representative being compelled to arbitrate the adequacy of a "finder's fee" offered by a member of the Exchange. But dicta in *Dickstein* comes closest to scrutinizing the precise question raised by this litigation. Before undertaking a further analysis of *Dickstein,* it would be more appropriate, however, at this stage to spell out the countervailing federal policies which militate against a finding requiring arbitration, as well as articulating the exemptions fashioned from those competing federal policies.

## II.

A related argument against arbitration propounded by the plaintiff is that because he is not a member of the Exchange, as specified in § 3(a)(3) of the 1934 Act, 15 U.S.C. § 78c(a)(3) (1970)[4] and because he has not agreed to be bound by the Exchange pursuant to § 28(b)(2) of the 1934 Act, 15 U.S.C. § 78bb(b)(2) (1970),[5] the agreement to submit to arbitration Rule 10b–5 claims is unenforceable under § 29(a) of the 1934 Act, 15 U.S.C. § 78cc(a) (1970).[6]

Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), a leading case construing the applicability of arbitration enforcement under § 14 of the Secu-

4. § 3(a)(3) of the 1934 Act specifically states:

"The term 'member' when used with respect to an exchange means any person who is permitted either to effect transactions on the exchange without the services of another person acting as broker, or to make use of the facilities of an exchange for transactions thereon without payment of a commission or fee or with the payment of a commission or fee which is less than that charged the general public, and includes any firm transacting a business as broker or dealer of which a member is a partner, and any partner of any such firm."

5. Section 28(b) reads:

"Nothing in this title shall be construed to modify existing law (1) with regard to the binding effect on any member of any exchange of any action

taken by the authorities of such exchange to settle disputes between its members, or (2) with regard to the binding effect of such action on any person who has agreed to be bound thereby, or (3) with regard to the binding effect on any such member of any disciplinary action taken by the authorities of the exchange as a result of violation of any rule of the exchange, insofar as the action taken is not inconsistent with the provisions of this title, or the rules and regulations thereunder."

6. Section 29(a) provides:

"Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

rities Act of 1933, 15 U.S.C. § 77n (1970) (§ 14's wording and scope are comparable to § 29(a) of the 1934 Act), denied enforcement of an agreement executed between a customer and a brokerage firm, which required all controversies arising out of the sales transaction to be submitted to arbitration. The rationale of the decision was that the 1933 Act was designed to protect the public investors and place them on an equal footing with the issuers of and dealers in securities, the latter being in a better position to appraise the merits of the particular securities transaction. The right to select a judicial forum was deemed to be so fundamental that it could not be waived by the security purchaser prior to a violation of the Securities Act.

Beginning with Brown v. Gilligan, Will & Co., 287 F.Supp. 766 (S.D.N.Y. 1968), the Courts have carved out an exemption from § 29(a) for members of the Exchange. See also, Coenen v. R. W. Pressprich & Co., 453 F.2d 1209 (2nd Cir. 1972), cert. denied 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972) [Arbitration required in action by an allied *member* (alleging, *inter alia*, § 10(b) violations) against a *member* firm]; Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838 (2nd Cir. 1971) (Defendant *non-member*, broker-dealer firm, in a suit raising § 10(b) claims, can *voluntarily* submit to arbitration and compel arbitration over objections of plaintiff-*member* firm); Revenue Properties Litigation Cases v. Cohn, Delaire & Kaufman, 451 F.2d 310 (1st Cir. 1971) (Both parties were broker-dealer *members* and arbitration was granted); Isaacson v. Hayden, Stone, Inc., *supra.*

■ The Court is in complete accord with the reasoning of Brown, *supra*, and adopts it in this case. § 28(b)(1) of the 1934 Act does exempt arbitration agreements between members of the Exchange from the coverage of § 29(a). But since Ayres is not a member of the Exchange and has not voluntarily waived his right to sue in a federal forum and thus submit to arbitration, see Axelrod & Co., *supra;* Moran v. Paine, Webber, Jackson & Curtis, 389 F.2d 242 (3rd Cir. 1968) (Stock purchaser voluntarily submitted to arbitration and was thereafter precluded from suing in federal court), the additional question which remains is whether under Rule 347(b) Ayres is exempted from § 29(a) and is bound by § 28(b)(2).

One reading of § 28(b)(2) encompasses *Moran, supra*, and *Axelrod & Co., supra*, situations where once an alleged securities infraction has occurred, then the non-member reserves the right either to proceed initially in Court or, conversely, can voluntarily forego that right and allow the matter to be submitted to arbitration. That is, after being fully apprised of grounds and facts which, *inter alia*, would give rise to possible Rule 10b–5 violations, the non-member can then agree to be bound by the Exchange. *Accord*, 2 A. R. Bromberg, Securities Law §§ 12.10(2) and 12.10(6), pp. 287–288.1, 290 (1968); 3 L. Loss, Securities Regulation 1811–1817 (1961); 6 L. Loss, Securities Regulation 3932–3937 (1969).

Returning now to *Dickstein, supra*, the Court there found the registered representative's reliance upon Wilko v. Swan, *supra*, to be misplaced since Dickstein had not purchased any securities, an understandable pre-requisite to invoking the holding of that case. In commenting upon the operative effect of § 28(b)(2) and its relationship to Rule 347(b) the Court in a footnote remarked:

" . . . While clause (2) may refer to the agreement of a third person to be bound by a decision settling a dispute between members, it may arguably cover an agreement by a member's employee to be bound by an exchange decision settling his own dispute." *Dickstein, supra*, 443 F.2d at 787, note 5.

In being employed as a registered representative, the plaintiff pursuant to Rule 347(b) has assented to arbitrate all disputes between himself and members of the Exchange which arise out of his employment or the termination of that employment. I find that where you have a registered representative who purchases securities from an employer-member firm *solely* because of his status as an employee, then that transaction is one which arises out of the course of that employment and can be referred to arbitration under Rule 347(b) and § 28(b)(2) of the 1934 Act, even though the controversy would otherwise not touch upon or concern the performance of the plaintiff's duties as a registered representative *qua* registered representative and the plaintiff's position would be analogous to that of a public investor.

The case at bar is not one where the securities purchaser, contemporaneously with the acquisition of the stock, executed an agreement prospectively waiving all rights to select a judicial forum for the resolution of any matters stemming from that transaction. Wilko v. Swan, *supra*. The requirement of arbitration here bears no relationship to Ayres' acquisition of the stock from Merrill Lynch, but arises from Ayres' consent under Rule 347(b) to arbitrate employment-related disputes. *Cf.* Revenue Properties Litigation Cases v. Cohn, Delaire & Kaufman, *supra*, 451 F.2d at 313; *Coenen, supra*, 453 F.2d at 1211–1214; *Axelrod, supra*, 451 F.2d at 840–843; *Brown, supra*, 287 F.Supp. at 769–775.

I recognize that the knowledge and expertise which Ayres possessed and attained over the years as a result of his employment as a registered representative still might not be commensurate with that of a member of the Exchange, particularly in a transaction such as here where material facts pertaining to Merrill Lynch stock were allegedly not disclosed either to stockholders or employees. But the previous statement is partially negated because of Rule 347(b) and because Ayres would never have even been permitted to acquire the securities but for his status as an employee of Merrill Lynch. The plaintiff truly stands in an anomalous posture. Although Rule 10b–5 claims are significant and are of fundamental importance to the securities industry, nonetheless, the questions posed do not lie beyond the purview of an arbitrator's province. Revenue Properties Litigation Cases, *supra*, 451 F.2d at 313–314.

To recapitulate, Ayres is being compelled to arbitrate his Rule 10b–5 claims solely because of his standing as a registered representative and his previously assenting to arbitrate all disputes which arise out of his employment or the termination of that employment pursuant to Rule 347(b) of the New York Stock Exchange. The acquisition of the shares in question came about only because of Ayres' status as an employee, and thus the transaction did arise out of his employment. Further, Rule 347(b) is an exception to § 29(a) of the 1934 Act and is therefore within the ambit of § 28(b)(2) of the 1934 Act. Finally, I specifically make no finding as to whether an employee of a member of the Exchange, but who is not a registered representative, would be compelled to arbitrate controversies which arose from a securities purchase merely, as is additionally one of the facts here, because the buyer pledged himself to be bound by the Constitution and Rules of the Board of Governors of the Exchange and any amendments thereto, when that purchaser applied for approval as a holder of non-voting stock of a member of the Exchange in accordance with Article IX, Section 7 of the Constitution of the New York Stock Exchange.

In ruling that this matter must be submitted to arbitration, my decision now should not in any way be construed

as my making a judgment on the merits or intimating any view as to what the ultimate disposition of this case should be. I might add, however, that an employee-stockholder should be entitled to the performance of the identical fiduciary obligations by the securities seller that would be owed to a customer stockholder, but that is not to say the fiduciary duties in the case at bar, in fact, were or were not breached. I assume that the arbitrator will of course consider the total equities involved and arrive at a result which is both just and fair for all the parties concerned.

Consistent with the foregoing discussion, defendant's motion for a stay is granted.